1
2
3
4
5
6
7
8                              UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RICHARD W. KOLLIN,                          No.  1:18-cv-00617-NONE-JLT

12                  Plaintiff,

13        v.                                     ORDER DENYING DEFENDANTS'
                                                 MOTION FOR SUMMARY JUDGMENT
14   CITY OF TEHACHAPI, et al.,
                                                 (Doc. No. 64)
15                  Defendants.

16

17

18          Plaintiff Richard W. Kollin filed this lawsuit against defendants City of Tehachapi and

19   various Tehachapi Police Department ("TPD") officials in their individual capacity, including

20   Officer Bruce Medina ("Medina"), Officer Jared McCombs ("McCombs"), Sergeant Amelia

21   Thompson, and Chief of Police Kent Kroeger (also in his official capacity), after plaintiff was

22   shot twice in the back during a foot pursuit by Officers Medina and McCombs.  Plaintiff brings a

23   claim for excessive use of force in violation of the Fourth Amendment to the U.S. Constitution, in

24   addition to state law claims for negligence, battery, and violation of California's Bane Act.  (Doc.

25   No. 33.)  Currently pending before the court is defendants' motion for summary judgment in

26   which they argue that the evidence presented:  (1) establishes that the shooting of plaintiff was

27   objectively reasonable under the Fourth Amendment; (2) entitles defendants to qualified

28   immunity; and (3) that plaintiff's state law claims fail in the absence of a constitutional violation.

                                                 1

1    (Doc. No. 64 at 2:5–8.)  For the reasons set forth below, defendants' motion for summary

2    judgment will be denied in its entirety.

3                                              **BACKGROUND**

4           The facts set forth below are based on the parties' submission of the joint statement of

5    material facts ("JF"),[1] which also includes plaintiff's material facts and defendants' responses

6    submitted thereto ("PF").  (Doc. No. 64-1.)  Because defendants are moving for summary

7    judgment, the evidence regarding the incident submitted by plaintiff is critical to the resolution of

8    the pending motion.  Below, the court will summarize all of the evidence before it on summary

9    judgment.

10   **A.     The Facts**

11          On May 24, 2017, plaintiff was driving for work when he decided to stop at a Holiday Inn

12   Express in Tehachapi, California ("Holiday Inn").  (PF ¶ 22.)  At approximately 11:15 p.m., TPD

13   received a report of a suspicious person—plaintiff—who had parked his vehicle in the parking lot

14   behind the Holiday Inn and had "been there for hours, and mov[ed] parking spots all night."

15   (Doc. No. 64-3 (computer-aided dispatch report); *see* JF ¶ 1.)  Officers Medina and McCombs

16   responded to the Holiday Inn, driving marked police vehicles.  (JF ¶¶ 1–2.)  Officer Medina knew

17   that there had been recent burglaries in the area, including at the Holiday Inn, and of one incident

18   where firearms were stolen from a vehicle.  (*Id.* ¶ 3 (plaintiff objecting as to relevance of Officer

19   Medina's knowledge); *see* Doc. No. 64-3 at 22 (deposition of Officer Medina).)[2]

20          Upon arriving at the parking lot, the officers stopped and detained plaintiff.  (JF ¶ 4.)

21   Officer Medina "thoroughly" searched plaintiff for 20 seconds but found no "obvious weapons."

22   (*Id.* ¶ 5; PF ¶ 25.)  The search was a "modified standing search," which consists of "having a

23   person spread their legs, in a standing position, with their back to the officer and hands interlaced

24   on top of the head."  (PF ¶¶ 24–25.)  The parties dispute whether Officer Medina patted down "all

25

26   _____

     [1]  Plaintiff contends that JF numbers 1–4, 6–9, 11–13, and 20–21 are undisputed but JF numbers
     5, 10, and 14–19 are disputed.  (Doc. No. 64-1 at 1:23–25.)

27

28   [2]  There is no evidence before the court on summary judgment that plaintiff was connected to any
     of the prior burglaries.

                                                      2

areas" where a person could conceal a firearm, because defendants assert that Officer Medina did not search plaintiff's "crotch or inside his boots." (PF ¶ 25; *but see* Doc. No. 64-5 at 10:5–7.)[3] Officer McCombs was aware that Officer Medina's modified standing search of plaintiff did not result in the recovery of any weapons. (PF ¶ 27.) Plaintiff also allowed Officer McCombs to search his vehicle. (JF ¶ 6.) Officer McCombs saw an empty holster and military fatigues but did not find any weapons inside plaintiff's vehicle. (*Id.*)

While being questioned, plaintiff falsely told one of the officers that his name was "Rick Knight." (*Id.* ¶ 7.) Plaintiff declares that Officer Medina was "very nervous and aggressive" during the questioning and was "constant[ly]" reaching for his firearm. (Doc. No. 65-11 ¶ 4.) According to plaintiff, Officer Medina's "nervous behavior caused [plaintiff] to fear for [his] life," and he "decided to run." (*Id.*) According the parties, it is undisputed that plaintiff fled from the officers while being lawfully detained. (JF ¶ 8.)

As he began to run, Officer Medina ordered plaintiff to "stop." (*Id.* ¶ 9.) Defendants assert that plaintiff yelled he had a gun and would shoot Officer Medina. (*Id.* ¶ 10; *see* Doc. No. 64-3 at 39 (deposition of Officer Medina).) Plaintiff disputes this. (JF ¶ 10.)[4] Officer Medina then performed a leg sweep on plaintiff, causing plaintiff to fall. (*Id.* ¶ 11.) Plaintiff stood up and Officer Medina deployed a taser against plaintiff, which was ineffective. (*Id.* ¶ 12.) Plaintiff continued to run away after Officer Medina's unsuccessful attempt to subdue plaintiff with a taser. (*Id.* ¶ 13.)

While running away again, defendants assert that plaintiff twice yelled again that he had a gun. (*Id.* ¶ 14; *see* Doc. No. 64-3 at 74 (deposition of Officer McCombs).) Plaintiff disputes

/////

/////

---

[3] Officer Medina testified at his deposition that he searched plaintiff by crossing his hand across plaintiff's waistband as far as his hand could reach that area. (Doc. No. 64-5 at 10:17–20.)

[4] Plaintiff disputes this, arguing that Officer Medina's statement is self-serving because: (1) Officer Medina's modified standing search discovered no weapons on plaintiff; (2) Officer McCombs knew the search revealed no weapons; and (3) both officers refused to provide an official statement regarding this incident until more than two months after the incident. (JF ¶ 10.)

1   this. (JF ¶ 14.)[5]  Officer McCombs broadcasted over the TPD radio that plaintiff had a gun. (JF

2   ¶ 15.)  Plaintiff continued to run from the officers. (*Id.* ¶ 16.)  Defendants assert that plaintiff

3   began to reach in his waistband at this point of the chase. (*Id.*; *see* Doc. No. 64-3 at 49

4   (deposition of Officer Medina), 75 (deposition of Officer McCombs).)  Plaintiff disputes making

5   this movement. (JF ¶ 16.)[6]  Defendants assert that Officer McCombs warned plaintiff to stop or

6   he would be shot. (*Id.* ¶ 17; *see* Doc. No. 64-3 at 76 (deposition of Officer McCombs).)  Plaintiff

7   purports to dispute that Officer McCombs provided such a warning. (JF ¶ 17.)[7]  Officer Medina

8   broadcasted over the TPD radio that plaintiff was reaching for his waistband. (*Id.* ¶ 18.)

9   Defendants assert that plaintiff then "abruptly turned clockwise (right) and extended his

10   right arm and fist in a shooting position." (JF ¶ 19; *see* Doc. No. 64-3 at 50–51 (deposition of

11   Officer McCombs), 77–78 (deposition of Officer McCombs).)  Plaintiff disputes that he made

12   these movements. (JF ¶ 19.)[8]  Officer McCombs then fired four shots and Officer Medina fired

13   _____

14   [5]  It would appear that plaintiff cannot dispute this evidence directly because he has no
     recollection of the incident.  Nonetheless, plaintiff contests this fact arguing that Officer Medina's

15   statement is self-serving because: (1) Medina's modified standing search revealed no weapons on
     plaintiff; (2) Officer McCombs knew the search revealed no weapons; and (3) both officers

16   refused to provide an official statement regarding this incident until after more than two months.
     (JF ¶¶ 10, 14, 16.)

17

18   [6]  Again, the basis for plaintiff's dispute with this evidence is based on his argument that Officer
     Medina's statement in this regard is self-serving for the same reasons set forth in fn. 5, above.

19

20   [7]  It does not appear that plaintiff actually disputes Officer McCombs' assertion of providing a
     warning before shooting.  Citing to the portion of Officer McCombs' deposition where he

21   testified that he warned plaintiff prior to shooting, plaintiff argues that only one inference can be
     drawn from the timing of Officer McCombs' warning, not that Officer McCombs failed to

22   provide a warning. (JF ¶ 17; PF ¶ 29 (Plaintiff "could not have posed any threat of imminent
     serious bodily harm or death because officer McCombs decided to fire at him *before* he allegedly

23   turned his torso and pointed his arm at him.").)

24   [8]  Plaintiff disputes this evidence on the basis that: (1) Officer McCombs decided to fire at
     plaintiff before plaintiff allegedly turned his torso and pointed his arm at the officers;

25   (2) defendants' expert witness fails to corroborate the officers' claims that plaintiff's arm was
     extended when he was shot; (3) defendants' trajectory analysis fails to support the officers'

26   claims that plaintiff's arm was extended when he was shot; (4) the shells from the bullet casings
     demonstrate that the officers were standing still, and not running, when they shot plaintiff; and

27   (5) the shells from the bullet casings also demonstrate that plaintiff had fallen to the ground
     before he was shot. (JF ¶ 19; PF ¶¶ 29–32.)

28

two shots at plaintiff, hitting him.  (JF ¶¶ 20, 21.)

Plaintiff contends that the other evidence before the court on summary judgment calls into question the version of the events precipitating the shooting offered by Officers McCombs and Medina.  First, plaintiff asserts that Officer McCombs decided to fire at him before he allegedly turned his torso and pointed his arm at the officer.  (PF ¶ 29; *see* Doc. No. 64-5 at 25 (deposition of Officer McCombs: "Prior to him turning, I had told him, 'Stop, or I'm going to shoot you.'")) Defendants do not dispute "[t]he timing of the warning."  (PF ¶ 29.)  Second, plaintiff contends that defendants' bullet-trajectory expert "fails to corroborate the officers' claim that [plaintiff] 'extended his right arm and made a fist in a shooting position.'"  (PF ¶ 30) (quoting JF ¶ 19) (*See* Doc. No. 64-5 at 27–28 (deposition of Jeremy J. Bauer).)  Defendants, however, counter by arguing that their expert has opined "that the evidence is consistent with the officers' statements." (PF ¶ 30.)  "In fact," plaintiff claims, "defendants' trajectory says *nothing* about the position of [plaintiff's] right arm.  It only confirms that [his] right side of his torso was facing the shooter." (*Id.* ¶ 31; *see* Doc. No. 64-5 at 27–28 (deposition of Jeremy J. Bauer).)  Plaintiff asserts that the evidence of the discharged bullet shell casings show that the officers were actually standing still at the time of the shooting, contrary to their earlier assertions that they were running when they fired upon plaintiff.  (PF ¶ 32.)  Plaintiff also claims that he "had likely fallen to the ground prior to being shot by both officers."  (*Id.*)  Defendants "do not dispute physical evidence," but note that plaintiff "offers no evidence to support his opinion" that the physical evidence demonstrates plaintiff did not pose an immediate threat prior to getting shot.  (*Id.*)

In any event, it is undisputed that plaintiff was unarmed during the entire incident.  (*Id.* ¶ 28 (undisputed but defendants objecting as immaterial post-incident discovery).)

## B.   Bullet Trajectory Analysis

Plaintiff has submitted a bullet trajectory schematic prepared by Kern County Coroner, Dr. Eugene Carpenter.  (Doc. No. 65-8; *see also* Doc. No. 65 at 13:20–22.)  Dr. Carpenter's schematic is labeled "Kollin," and portrays two sides of a human body (i.e., the front and the back) to demonstrate the location on plaintiff's body where the bullets fired by the officers entered him, as well as the angle from which they entered his body.  (*Id.*)  The schematic prepared

by Dr. Carpenter shows that plaintiff was shot twice on the back side of his body.  (*Id.*)  The first

bullet entered through the back of plaintiff's right shoulder.  (*Id.*)  The schematic shows that the

first bullet traveled from a point lower than plaintiff's right shoulder, at a 45-degree angle in an

upward direction, until it entered the back of plaintiff's right shoulder.  (*Id.*)  The second bullet

entered through the back side of plaintiff's right flank region.  The schematic shows that the

second bullet traveled from a point higher than plaintiff's flank, at a 45-degree angle in a

downward direction, until it entered the back side of plaintiff's right flank.  (*Id.*)  Plaintiff also

cites two exchanges from Dr. Carpenter's deposition to support his assertion that the bullet wound

evidence demonstrates that plaintiff may have been in a sitting position on the ground, with his

torso upright at the time he was shot.  (Doc. No. 65-9 at 1:23–2:18, 3:14–4:14.)

Additionally, plaintiff has submitted an excerpt of the deposition of defendants' expert

witness, Dr. Jeremy Bauer.  (Doc. Nos. 64-5 at 27–28; 65 at 15:5–10.)  Plaintiff highlights the

following exchange from Dr. Bauer's deposition:

> Q: [] Now, going to your opinion, your final opinion, basically it's
> your opinion that Mr. Kollin was struck in the right side of the body
> by two bullets, and that was consistent with him being rotated 90
> degrees with respect to the path of the bullet, right?
>
> A: Correct.
>
> Q: Again, his body's upper torso being – rotating 90 degrees to the
> shooter tells us nothing about the actual position of his right arm.
> True?
>
> A: Again, it doesn't tell us exactly where his right arm is, but we
> can rule out certain positions.
>
> Q: We can rule out that the arm was pressed against his right flank,
> right?
>
> A: Correct.
>
> Q: And that's about all you can rule out?
>
> A: As far as the shot to the flank and his right arm, correct."

(Doc. No. 64-5 at 27:14–28:6.)

In addition, plaintiff points to two photographs that purportedly show where the bullet

casings were recovered at the scene of the shooting.  (Doc. No. 64-5 at 31–32.)  Though the bullet

1    casings are difficult to locate in the photographs before the court on summary judgment, the

2    evidence markers in the field show that those casings were found about a foot, if not less, from

3    each other.  (*See id.*)

4    **C.    Aerial Photograph and Video Surveillance of the Holiday Inn Parking Lot**

5            Plaintiff has submitted an aerial photograph of the Holiday Inn and the adjacent field.

6    (Doc. No. 64-5.)  The photo includes markers identifying where plaintiff's vehicle was parked,

7    where the police vehicles were parked, where an officer's notebook was recovered, where a taser

8    was found, and where bullet casings were recovered.  (*Id.*)  The field is south of the parking lot

9    and the Holiday Inn.  (*Id.*)  Just south of the parking lot is a sidewalk, a road, another sidewalk,

10   and then the field.  (*Id.*)  The aerial photo includes a measurement legend estimating the actual

11   distances between various aspects of the scene.  (*Id.*)  The field is about 100 feet south of the

12   parking lot.  (*See id.*)

13           The Holiday Inn video surveillance footage has been submitted on summary judgment by

14   both parties (hereinafter "Holiday Inn Video").  (Doc. Nos. 64-3 at 88; 65-1.)  The video is taken

15   from some distance and it is therefore impossible to identify the officers or plaintiff on the video.

16   (*See id.*)  However, based on the parties' representations, the court assumes the video accurately

17   portrays the following events:  plaintiff was parked at the edge of the Holiday Inn parking lot.

18   (*Id.* at 22:12:30.)  One patrol vehicle entered the video frame from the left, and one entered the

19   video frame from the bottom.  (*Id.* at 22:13:15–50.)  Because of the brightness of the parking lot

20   lampposts and the patrol vehicle lights, it is difficult to ascertain exactly what occurred next.  It

21   appears plaintiff and one police officer were in close proximity to one another (which could be

22   when plaintiff was searched), while one police officer approached plaintiff's vehicle (which could

23   be when plaintiff's vehicle was searched).  (*Id.* at 22:14:00–19:30.)  When one of the officers

24   finished what appears to be the possible search of plaintiff's vehicle, that officer joined plaintiff

25   and the other officer near the patrol car that had entered from the left side of the camera angle.

26   (*Id.* at 22:19:30.)  For the next eight minutes of the video, it appears that plaintiff and both

27   officers were near the hood of the patrol car.  (*Id.* at 22:19:30–27:30.)  Then, one of the officers

28   returned to plaintiff's vehicle.  (*Id.* at 22:27:30.)  Plaintiff and one of the officers appear to remain

at the hood of the patrol car for approximately two more minutes.  (*Id.* at 22:27:30–29:40.)  At that point, plaintiff can be seen fleeing on foot in a southward direction toward the field.  (*Id.* at 22:29:40–45.)  Both officers gave chase.  (*Id.*)  Plaintiff is in the video camera's frame for approximately seven or eight seconds and, during that time, it does not appear that either officer made any contact with plaintiff.  (*Id.* at 22:29:45–29:53.)

Defendants have submitted another copy of the Holiday Inn Video with an audio recording of TPD dispatch and the officers overlaid onto the video.  (Doc. No. 64-3 at 86.)  The audio-overlaid copy of the video does not provide any more visual clarity with respect to the incident.  (*See id.*)

### D.  Plaintiff's Interview with the District Attorney's Office

Plaintiff has submitted an audio recording of his interview with a Kern County Deputy District Attorney, conducted about 10 months after the shooting and outside the presence of his counsel.  (Doc. No. 65-3.)  During the approximately one-hour long interview, plaintiff was questioned about the incident but provided few details.  Rather, plaintiff stated he did not remember much.  With respect to the beginning of the encounter, plaintiff did respond that he remembered one of the police officers reaching for his gun and that this made plaintiff nervous.  (*Id.* at 16:25–41.)  Other than this recollection, plaintiff denied recalling any details from his initial encounter with Officers Medina and McCombs.  For example, plaintiff stated during this interview that he did not remember being searched or being patted down by any officer.  (*Id.* at 16:43–56.)  He also denied remembering anything  about what the officers said during the encounter.  (*Id.* at 15:51–16:11.)  The following exchange took place at the interview when plaintiff was asked about his recollection of when he decided to flee from the officers:

> Q: So, you ran.  And what—what's going through your mind when you're running?
>
> A: I'm going to be honest with you, ok?
>
> Q: Mhm.
>
> A: Ok?
>
> Q: Please.

1
2
3
4

> A: I'm going to be honest with you.  God is my witness.  And he's sitting here right now.  I said to myself, "God, please watch over me and please protect me [unintelligible].  This is not going to happen."  Right?  And I said, "When I die God, you come get me."  That's what I said.  Because why?  Because I knew I was going to die.

5   (*Id.* at 23:30–50.)  Plaintiff told his interviewer that he did not recall if he said anything to the

6   officers while running away from them.  (*Id.* at 30:53–31:09.)  He also stated that he did not recall

7   how much time passed between when he initially fled and when the officers shot him.  (*Id.* at

8   23:53–23:58.)  According to plaintiff, he did not remember being tased.  (*Id.* at 29:03–13.)

9   Additionally, plaintiff stated that he did not remember the moment that he was shot.  (*Id.* at

10   24:47–55, 32:00–20.)  However, during the interview plaintiff did provide the following:

11
12

> Q: At some point while they are pursuing you, did you ever turn around and try to scare them off or fight back or something like that?

13

> A: No, nothing like that.

14
15

> Q: Did you ever sort of turn around, like "Hey, I—I got a gun," to make them stop or something like that?

16
17

> A: Oh no, there is no way.  I would have never done anything like that.  I would have never—you know—and I didn't have a gun, so why would I say that?  I don't have a gun.

18   (*Id.* at 33:35–34:03.)

19          With respect to the end of the incident, plaintiff told the interviewer that he remembered

20   someone telling him to show his hands after was shot and on the ground.  (*Id.* at 24:54–25:05.)

21   Therefore, at the time of his interview at the District Attorney's Office, the statement by plaintiff

22   the closest in time to the incident, it appears that plaintiff remembered only why he decided to

23   flee from the officers, that he did not turn and threaten officers or tell him he had a gun and then

24   waking up on the ground after he was shot.  (*See, e.g.*, *id.* at 16:12–20 ("So I didn't feel

25   comfortable, and I took off.  And when I took off, I remember gunshots.  And when I got shot, I

26   was on the ground.  And that's all that I remember.").)

27   /////

28   /////

9

**E.  Plaintiff's Deposition Testimony**

Plaintiff and defendants have both submit various excerpts from plaintiff's deposition in support of and in opposition to the pending motion for summary judgment.  Just as was the case during his interview at the Kern County District Attorney's Office, at his deposition plaintiff claimed to remember scant facts surrounding the incident giving rise to this litigation.  This is reflected in the following exchange at his deposition:

> Q: You told me a couple minutes ago that at some point in between when you were shot and when you remember being wheeled across the ground that you were completely knocked out and that you weren't coherent on what happened.
>
> So what I'm trying to get at is – I guess I want to know the last thing you recall before that period where you were completely knocked out.  I want to know, for example, did you hit the ground or did you stop forming memories while you were still standing and running?   I just want to know what happened immediately preceding that period [prior to losing consciousness] --
>
> A: I don't remember.  I just don't remember.  I don't remember that.  I don't remember getting shot and I don't remember – my memory just went completely – I've tried to – I've tried to go over this in my head, but I haven't been able to.
>
> ***
>
> Q: [] What is the last thing you remember?  Is it talking to that police officer in the hotel parking lot?
>
> A: You know, I remember parts of it, but it's like I just can't get it.  I can't put it together.  And that's why they even asked me, do you did he search you, and I said no, because I don't remember.  I just don't remember.  I can't – and for the life of me, I can't figure this out.  It's driving me crazy.  You know, I want to be able to remember.  I want this to come back to me, but I cannot remember.  I can't remember stuff that I used to remember, like I could do fractions.  I can't do them now.  Why is that?
>
> Q: Okay.  Well, I think we're getting close because we've been talking about you and this police officer having a conversation.
>
> I just want to know if that's the last thing you remember or you remember anything after that?
>
> A: You know, if – if I told you anything, it would be something that I think that happened and I'm not going to think it.  I want to know it.  I want to know for sure.
>
> Q: So do I, which is why I keep asking what's the last thing you know happened before this period of time where your memory cuts in?

10

A: Okay.  I don't – I don't – I don't remember.  I can't – I can't be accurate.  I can't be a – I can't be a good witness to it.  You know, as much as I want to be a good witness to it, I want to be a really good witness and say this is what happened, this is what they did.  But I do remember these things, certain things as I go, I remember that, I remember it.  And I know myself, I would never run from a cop.  I would never do that.  I had no reason to do that.  That's not what I would do.  I don't do those things.

(Doc. No. 64-3 at 3:5–21, 8:6–9:14.)

At his deposition, plaintiff testified he was not even sure how the encounter with Officers Medina and McCombs began.  (*Id.* at 10:15–18 ("I'm sure that, you know, he just didn't all of a sudden appear.  You know, but I just don't remember exactly how – it was done or whatever.").)  Plaintiff testified at least twice in his deposition that he did not remember being searched by the officers.  (*Id.* at 5:16–23, 6:10–12, 8:10–13.)  While plaintiff remembered at his deposition that one of the officers appeared nervous (*id.* at 6:1–9), he could not give a physical description of that officer.  (*Id.* at 6:15–16 ("I don't remember anything about him.").)  Plaintiff could not remember running through the field, but only thought he must have done so, since that's what he had been told by his attorney.  (*Id.* at 4:6–12, 4:21–23.)  At his deposition, plaintiff also testified he did not remember having his legs swept out from under him during the officers' foot pursuit.  (*Id.* at 12:2–5.)  The following exchange at plaintiff's deposition addressed the end of that foot pursuit:

Q: Do you have any memory of making a gesture whereby you pointed back towards the police with your right hand right before you got shot?

A: No, I don't – I don't have anything – I would – would never even – why would I – I'm trying to run from the cops.  Why would I point back and wave at them?

(*Id.* at 65-4 at 1:8–14.)  Finally, plaintiff testified he did not remember being shot.  (Doc. No. 64-3 at 7:4–5.)

**F.  Plaintiff's Declaration Submitted in Opposition to the Summary Judgment Motion**

Plaintiff has also submitted a declaration in opposition to defendants' summary judgment motion.  (Doc. No. 65-11.)  Therein, plaintiff declares as follows.  At the time of the incident, he weighed about 220 pounds and was about five feet and three inches tall.  (*Id.* ¶ 1.)  On the night in question, he was wearing shorts, a t-shirt, and a pair of work boots and was on his way to

11

1    Bakersfield to pick up a throttle cable for his septic truck.  (*Id.* ¶¶ 1–2.)

2          While parked in the Holiday Inn parking lot, plaintiff was approached by the officers.

3    (*See id.* ¶ 3.)  Plaintiff consented to his body and car being searched, but he did not have a

4    weapon on his body or in his car.  (*Id.*)  As Officer Medina began to question him, Officer

5    Medina "appeared very nervous and aggressive" and was repeatedly "reaching for his firearm."

6    (*Id.* ¶ 4.)  Accordingly, plaintiff decided to run.[9]  (*Id.*)  Although he addressed the foot pursuit,

7    plaintiff's declaration provides few details about it.  (*See id.* ¶¶ 4–7.)  According to plaintiff, he

8    "lost consciousness" after he fell to the ground and felt the taser make contact with his body.  (*Id.*

9    ¶ 6.)  He "woke up on a gurney and found out [he] was shot twice in [his] back area" and was

10   then airlifted to a hospital for medical care.  (*Id.* ¶ 7.)  Plaintiff declares that "[a]t no point during

11   the entire incident did [he] threaten the officers nor did [he] 'turn [his] torso clockwise' and 'point

12   [his] right arm at them.'"  (*Id.* ¶ 5.)

13         Plaintiff avers that he suffers from "partial memory loss" as a result of the shooting

14   incident.  (*Id.* ¶ 8.)  "Mentally, [he] experience[s] periods of time when it's arduous coping with

15   memories of the traumatic and near-death experience."  (*Id.* ¶ 10.)  According to his declaration,

16   this "experience has been, and persists to be, physically debilitating as [he] continue[s] to endure

17   numbing pain and limited mobility."  (*Id.*)

18         As a threshold matter, defendants argue the court to find that plaintiff submitted a "sham

19   affidavit" in opposition to the pending motion for summary judgment and disregard plaintiff's

20   declaration.  (Doc. No. 68 at 2–5.)  "The general rule in the Ninth Circuit is that a party cannot

21   create an issue of fact by an affidavit contradicting his prior deposition testimony."  *Van Asdale v.*

22   *Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) (quoting *Kennedy v. Allied Mut. Ins. Co.*,

23   952 F.2d 262, 266 (9th Cir. 1991)).  A district court may "disregard 'sham' affidavits that

24   contradict deposition testimony submitted solely to generate [an] issue of fact for summary

25   judgment purposes."  *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 728 (9th Cir. 1997).  At

26   the same time, however, "the sham affidavit rule should be applied with caution because it is in

27   _____

28   [9]  Plaintiff provides no other details of the initial encounter and does not address in his declaration any words spoken between him and the officers.

1    tension with the principle that the court is not to make credibility determinations when granting or

2    denying summary judgment" or weighing conflicting evidence.  *Yeager v. Bowlin*, 693 F.3d 1076,

3    1080–81 (9th Cir. 2012) (internal quotations and citation omitted); *see also Van Asdale*, 577 F.3d

4    at 998.  There are thus two important limitations on a district court's discretion to disregard a

5    sham affidavit.  *Van Asdale*, 577 F.3d at 998.  First, the district court must make a factual

6    determination that the contradiction was actually a "sham"; and second, the inconsistency

7    between the prior testimony and subsequent affidavit must be clear and unambiguous.  *Id*. at 998–

8    99.  The non-moving party is not prohibited from elaborating on or clarifying prior testimony and

9    "minor inconsistencies that result from an honest discrepancy, mistake, or newly discovered

10   evidence."  *Id*. at 999.

11         In *Yaeger*, for example, the plaintiff testified during his deposition that he "did not recall"

12   the answer to many questions that were "central to the case."  693 F.3d at 1080.  Three months

13   later in opposition to a motion for summary judgment, he submitted a declaration recalling "those

14   same events with perfect clarity" but provided no "credible explanation as to how his recollection

15   was refreshed."  *Id.*  The disparity between the deposition testimony and declaration was "so

16   extreme" as to render them contradictory, and the Ninth Circuit concluded that the district court

17   was within its discretion to disregard the plaintiff's declaration as a sham.  *Id.* at 1081; *see also*

18   *Kennedy*, 952 F.2d at 266 ("[I]f a party who has been examined at length on deposition could

19   raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this

20   would greatly diminish the utility of summary judgment as a procedure for screening out sham

21   issues of fact." (quoting *Foster v. Arcata Assocs., Inc.*, 772 F.2d 1453, 1462 (9th Cir.1985))).

22         It is true that in this case, plaintiff could hardly recall any details regarding the shooting

23   incident based on his personal knowledge during his deposition.  He testified that he remembered

24   one of the officers appeared nervous and certain events after he was shot.  (Doc. No. 64-3 at 6:1–

25   9, 7:11–8:5.)  But plaintiff repeatedly testified he did not remember anything else about the

26   shooting incident, and even stated he could not be a "good witness to it."  (*Id.* at 9:7–9.)  Now,

27   plaintiff states in his declaration that "[a]t no point during the incident" did he threaten the

28   officers in any manner.  (Doc. No. 65-11 ¶ 5.)  This inconsistency between plaintiff's deposition

13

1    and his declaration would appear to be "clear and unambiguous" with respect to his current claim

2    of never threatening the officers. *See Van Asdale*, 577 F.3d at 998–99.  Plaintiff argues that to the

3    extent his deposition testimony appears to contradict his declaration, the inconsistency can be

4    explained by his claimed trauma-induced memory loss.  (*See* Doc. No. 65-11 ¶¶ 8, 10.)  However,

5    plaintiff offers no medical evidence to support this claim.  In addition, it is unclear how a

6    purported trauma-induced memory loss would explain why plaintiff forgot critical details about

7    the shooting during his deposition but then remembered them later in opposing summary

8    judgment.  *See Yeager*, 693 F.3d at 1081.  However, the court is also compelled to note that

9    plaintiff's declaration in critical respects is consistent with his earlier recorded statement; the one

10   he gave to the Deputy District Attorney closer in time to the incident and in which he denied ever

11   threatening the officers during the foot pursuit.  (*See* Doc. No. 65-3 at 33:35–34:03.)[10]

12           Defendants appear to go a step further in arguing plaintiff's lack of memory regarding the

13   incident means he cannot survive summary judgment.  (*See* Doc. No. 68 at 4–5.)  However, as

14   discussed in further detail below, plaintiff has come forward with evidence—not based on his

15   own memory—giving rise to reasonable inferences that support his version of the shooting.  *See*

16   *Eliot v. Cty. of Orange*, No. SACV 14-893-CJC, 2016 WL 11505590, at *5 (C.D. Cal. Dec. 1,

17   2016) (denying defendants' motion for summary judgment where the plaintiff "d[id] not recall the

18   incident" of excessive force because he presented other facts that supported his version of the

19   incident).  For instance, plaintiff points to Officer Medina's deposition testimony regarding the

20   extent of the search of plaintiff that occurred and established he was not armed, (Doc. No. 64-5 at

21   9–16), the materially inconsistent testimony of the officers regarding plaintiff's verbal threats,

22   (*compare* Doc. Nos. 64-3 at 39:18–20, *and id.* at 72–74, *with id.* at 69:7–9, *and* 65-6 at 3:21–4:4),

23   the schematics of the scene and the testimony of a Kern County coroner regarding plaintiff's body

24   position when he was shot twice in the back, (Doc. Nos. 65-8, 65-9), and the testimony of

25

26   ───────────────
     [10]  The court recognizes, as defendants note, that plaintiff also appears to contradict himself with
27   respect to when he lost consciousness during the incident.  He went from not remembering when
     he lost consciousness to knowing the precise moment it happened (i.e., after he was tased).
28   (*Compare* Doc. Nos. 64-3 at 3:10–17, *with* 65-11 ¶ 6.)  Regardless of the precise moment plaintiff
     lost consciousness, the fact remains that he remembers very little from the shooting incident.

1   defendants' own expert regarding the positioning of plaintiff's arm at the time he was shot.  (Doc.

2   No. 64-5 at 27:14–28:6.)  Accordingly, the court need not resolve the question of whether

3   plaintiff's declaration in opposition to summary judgment is a sham affidavit, because even if the

4   court disregards his declaration, disputed issues of material fact have been established by the

5   evidence before the court thereby precluding a grant of summary judgment in favor of defendants.

6   **LEGAL STANDARD**

7          Summary judgment is appropriate when the moving party "shows that there is no genuine

8   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

9   Civ. P. 56(a).  In summary judgment practice, the moving party "initially bears the burden of

10  proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig*., 627 F.3d

11  376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving

12  party may accomplish this by "citing to particular parts of materials in the record, including

13  depositions, documents, electronically stored information, affidavits or declarations, stipulations

14  (including those made for purposes of the motion only), admissions, interrogatory answers, or

15  other materials" or by showing that such materials "do not establish the absence or presence of a

16  genuine dispute, or that the adverse party cannot produce admissible evidence to support the

17  fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  If the moving party meets its initial responsibility, the

18  burden then shifts to the opposing party to establish that a genuine issue as to any material fact

19  actually does exist.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586

20  (1986).  In attempting to establish the existence of this factual dispute, the opposing party may

21  not rely upon the allegations or denials of its pleadings but is required to tender evidence of

22  specific facts in the form of affidavits, and/or admissible discovery material, in support of its

23  contention that the dispute exists.  *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11;

24  *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider

25  admissible evidence in ruling on a motion for summary judgment.").  The opposing party must

26  demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the

27  suit under the governing law, *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *T.W.*

28  *Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the

15

1  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

2  nonmoving party.  *See Wool v. Tandem Computs., Inc*., 818 F.2d 1433, 1436 (9th Cir. 1987).

3         In the endeavor to establish the existence of a factual dispute, the opposing party need not

4  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

5  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

6  trial."  *T.W. Elec. Serv*., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

7  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

8  *Matsushita*, 475 U.S. at 587 (citations omitted).

9         "In evaluating the evidence to determine whether there is a genuine issue of fact," the

10  court draws "all reasonable inferences supported by the evidence in favor of the non-moving

11  party."  *Walls v. Cent. Contra Costa Cty. Transit Auth*., 653 F.3d 963, 966 (9th Cir. 2011).  It is

12  the opposing party's obligation to produce a factual predicate from which the inference may be

13  drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985),

14  *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Undisputed facts are taken as true for purposes of a

15  motion for summary judgment.  *Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 745

16  (9th Cir. 2010).  To demonstrate a genuine issue, the opposing party "must do more than simply

17  show that there is some metaphysical doubt as to the material facts . . ..  Where the record taken

18  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

19  'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

20         Finally, where there is video evidence of the incident giving rise to the excessive force

21  claim, a court must "view[] the facts in the light depicted by the videotape."  *Scott v. Harris*, 550

22  U.S. 372, 380–81 (2007).  Nonetheless, even where video evidence exists, the circumstances may

23  be such that a reasonable factfinders could draw divergent conclusions from what the video

24  evidence shows.  *See S.R. Nehad v. Browder*, 929 F.3d 1125, 1132–39 (9th Cir. 2019) (disputed

25  issues of material fact precluded summary judgment in an action alleging excessive use of force

26  even though the evidence included surveillance footage); *Glenn v. Washington Cty.*, 673 F.3d

27  864, 878 (9th Cir. 2011) ("The circumstances of this case can be viewed in various ways, and a

28  /////

1  jury should have the opportunity to assess the reasonableness of the force used after hearing all

2  the evidence.").

3       Below, the court will consider each of the arguments advanced in support of defendants'

4  motion for summary judgment in light of these standards.

5                                    **DISCUSSION**

6       Title 42 U.S.C. § 1983 provides a cause of action for the deprivation of "rights, privileges,

7  or immunities secured by the Constitution or laws of the United States" by a person acting "under

8  color of any statute, ordinance, regulation, custom, or usage." *Gomez v. Toledo*, 446 U.S. 635,

9  639 (1980).  To succeed on his § 1983 claim, plaintiff must demonstrate that the action

10 (1) occurred "under color of state law," and (2) resulted in the deprivation of a constitutional or

11 federal statutory right.  *Leer v. Murphy*, 844 F.2d 628, 632–33 (9th Cir. 1988) (citations omitted);

12 *see also West v. Atkins*, 487 U.S. 42, 48 (1988); *Parratt v. Taylor*, 451 U.S. 527, 535 (1981).  As

13 the moving party, defendants bear the initial on summary judgment of pointing out "an absence of

14 evidence to support [plaintiff's] case."  *Celotex*, 477 U.S. at 325.

15 **A.       The Claimed Constitutional Violation:  Excessive Force**

16      Under the Fourth Amendment, "[t]he right of the people to be secure in their persons,

17 houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and

18 no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  "The Fourth

19 Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those

20 which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citations omitted); *see*

21 *also United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997) ("For purposes of the

22 Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force

23 or show of authority, in some way restrains the liberty of a citizen.").

24      The Fourth Amendment requires law enforcement officers making an arrest to use only an

25 amount of force that is objectively reasonable in light of the circumstances facing them. *Graham*

26 *v. Connor,* 490 U.S. 386, 395 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985).  Determining

27 the objective reasonableness of a particular use of force, requires balancing the "nature and

28 quality of the intrusion on the individual's Fourth Amendment interests against the countervailing

1   governmental interests at stake." *Graham*, 490 U.S. at 396.  Under this standard, "'[t]he force

2   which [i]s applied must be balanced against the need for that force:  it is the need for force which

3   is at the heart of the *Graham* factors.'"  *Liston v. Cty. of Riverside*, 120 F.3d 965, 976 (9th Cir.

4   1997) (quoting *Alexander v. City & Cty. of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994));

5   *see also Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003).

6   Thus, in light of the facts and circumstances surrounding a law enforcement officer's actions,

7   courts "must balance the nature of the harm and quality of the intrusion on the individual's Fourth

8   Amendment interests against the countervailing governmental interests at stake."  *Bryan v.*

9   *MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010) (internal quotations and citation omitted); *see*

10  *also Scott*, 550 U.S. at 383–84; *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002); *Deorle v.*

11  *Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001); *Liston*, 120 F.3d 976.  Thus, "[f]orce is

12  excessive when it is greater than is reasonable under the circumstances."  *Santos*, 287 F.3d at 854

13  (citing *Graham*, 490 U.S. 386).

14          "Because the test of reasonableness under the Fourth Amendment is not capable of precise

15  definition or mechanical application, however, its proper application requires careful attention to

16  the facts and circumstances of each particular case, including the severity of the crime at issue,

17  whether the suspect poses an immediate threat to the safety of the officers or others, and whether

18  he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.

19  (internal quotations and citation omitted).  "[T]he reasonableness of force used is ordinarily a

20  question of fact for the jury."  *Liston*, 120 F.3d at 976 n.10.  "Because the excessive force inquiry

21  nearly always requires a jury to sift through disputed factual contentions, and to draw inferences

22  therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as

23  a matter of law in excessive force cases should be granted sparingly."  *Avina v. United States*, 681

24  F.3d 1127, 1130 (9th Cir. 2012) (internal quotations and citations omitted); *see also Green v. City*

25  *& Cty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) ("Because this inquiry is inherently

26  fact specific, the 'determination whether the force used to effect an arrest was reasonable under

27  the Fourth Amendment should only be taken from the jury in rare cases.'" (citation omitted)).

28  /////

First, with respect to the nature and quality of the intrusion at issue here, shooting a suspect with a firearm constitutes use of deadly force. *Blanford v. Sacramento Cty.*, 406 F.3d 1110, 1115 n.9 (9th Cir. 2005) (defining "deadly force" as "force creating a substantial risk of causing death or serious bodily injury" (citing *Smith v. City of Hemet*, 394 F.3d 689, 704–07 (9th Cir. 2005) (en banc))). It is well established that:

> The intrusiveness of a seizure by means of deadly force is unmatched. The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a fundamental interest in his own life and because such force frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.

*A. K. H. by & through Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (internal quotations and citations omitted). Accordingly, "[d]eadly force is permissible only 'if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm.'" *Id.* (quoting *Garner*, 471 U.S. at 11).

Having identified the quantum of force at issue, the court must balance the use of that force against the need for such force. *See Glenn*, 673 F.3d at 871; *Bryan*, 630 F.3d at 823; *Liston*, 120 F.3d at 976. In analyzing the government's interests at issue, courts must consider a number of factors, including (1) the severity of the crime, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight, and any other exigent circumstances. *Estate of Diaz v. City of Anaheim*, 840 F.3d 592, 605 (9th Cir. 2016); *Glenn*, 673 F.3d at 872; *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc); *Deorle,* 272 F.3d at 1280. Courts may also consider, when appropriate, whether a warning was given before force was used. *See Deorle*, 272 F.3d at 1283–84 ("[W]arnings should be given, when feasible, if the use of force may result in serious injury, and . . . the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test."); *see also Glenn*, 673 F.3d at 876 (in determining whether an officer's shooting was reasonable under the Fourth Amendment, courts consider "whether officers gave a warning before employing the force" at issue."). Ultimately, the court must

19

1  "examine the totality of the circumstances and consider whatever specific factors may be

2  appropriate in a particular case, whether or not listed in *Graham*." *Hughes v. Kisela*, 862 F.3d

3  775, 779 (9th Cir. 2016) (internal quotations and citation omitted), *rev'd on other grounds*,

4  ___U.S.____, 138 S. Ct. 1148 (2018); *Mattos*, 661 F.3d at 441.

5          Here, it is undisputed that Officers Medina and McCombs shot plaintiff after he ran from

6  them and they pursued him on foot.  (JF ¶¶ 8, 13, 20–21.)  The Ninth Circuit has explained that in

7  this context, "the Supreme Court has crafted a more definitive rule:  An officer may use deadly

8  force to apprehend a fleeing suspect only if 'the officer has probable cause to believe that the

9  suspect poses a threat of serious physical harm, either to the officer or to others.'" *Orn v. City of*

10 *Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020) (quoting *Garner*, 471 U.S. at 11) (involving an

11 officer who shot at a suspect attempting to flee in a vehicle).  While both parties mention all three

12 *Graham* factors in connection with the pending motion for summary judgment, the primary focus

13 of their briefs is on whether plaintiff posed an immediate threat to the officers.  (*See* Doc. Nos. 64

14 at 15:15–16:24; 65 at 19:24–23:2.)  The court agrees that this is the critical issue for purposes of

15 resolving defendants' motion for summary judgment. *See Vos v. City of Newport Beach*, 892

16 F.3d 1024, 1031–32 (9th Cir. 2018) (explaining that "whether [the suspect] posed an immediate

17 threat to the safety of officers or others" was "[t]he most important factor").  "The key question,

18 then, is whether [Officers Medina and McCombs] had an objectively reasonable basis for

19 believing that [plaintiff] posed a threat of serious physical harm" to the officers. *See Orn*, 949

20 F.3d at 1174.  In the context of defendants' motion for summary judgment, this analysis must be

21 /////

22 /////

23 /////

24 /////

25 /////

26 /////

27 /////

28 /////

1    undertaken while viewing the facts in a light most favorable to plaintiff.[11]

2         1.  <u>Did Plaintiff Pose an Immediate Threat to the Officers?</u>

3         The most important governmental interest factor is whether the suspect poses an

4    immediate threat to the safety of the officer or others.  *Hughes*, 862 F.3d at 779; *A. K. H.*, 837

5    F.3d at 1011; *Bryan*, 630 F.3d at 826; *Smith*, 394 F.3d at 702; *see also Rodriguez v. Swartz*, 899

6    F.3d 719, 728–29 (9th Cir. 2018), *vacated on other grounds*, 140 S. Ct. 1258 (mem.).  It has been

7    recognized that "[a] desire to resolve quickly a potentially dangerous situation is not the type of

8    governmental interest that, standing alone, justifies the use of force that may cause serious

9    injury."  *Hughes*, 862 F.3d at 780 (quoting *Deorle*, 272 F.3d at 1281); *see also Estate of Diaz*,

10   840 F.3d at 605; *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013); *Deorle*, 272 F.3d at 1281

11   ("[A] simple statement by an officer that he fears for his safety or the safety of others is not

12   enough; there must be objective factors to justify such a concern.").  Accordingly, "even when a

13   felony suspect tries to escape, 'where the suspect poses no immediate threat to the officer and no

14   threat to others, the harm from failing to apprehend him does not justify the use of deadly force to

15   do so.'"  *Rodriguez,* 899 F.3d at 729 (quoting *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir.

16   1997)).  Moreover, "[l]aw enforcement officials may not [use deadly force against] suspects who

17   do not pose an immediate threat to their safety or to the safety of others simply because they are

18   armed."  *Roderick*, 126 F.3d at 1204; *see also George*, 736 F.3d at 838 (It has long been

19

_____

20   [11]  Plaintiff argues that the standard applied by courts when a suspect dies in-custody should
     apply here because he lost consciousness and suffers from memory loss.  (Doc. No. 65 at 21:8–
21   12.)  The Ninth Circuit has explained that cases involving an in-custody death pose "a particularly
     difficult problem" because "the witness most likely to contradict [an officer's] story" is not
22   available to testify.  *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794–95 (9th Cir. 2014) (quoting
     *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).  In such cases, the court must "carefully
23   examine" the evidence "to determine whether the officer's story is internally consistent and
     consistent with other known facts."  *Id.* (explaining courts "must also examine 'circumstantial
24   evidence that, if believed, would tend to discredit the police officer's story'").  There is no
     authority for the proposition that this standard applies where the plaintiff allegedly lost
25   consciousness and has a limited recollection of the events but is still alive and able to testify.
     Accordingly, the undersigned rejects plaintiff's unsupported argument in this regard, while noting
26   that adoption of plaintiff's contention would not change the outcome under the standard approach
     which requires viewing the evidence presented in a light most favorable to plaintiff and drawing
27   all reasonable inferences in his favor as the party opposing summary judgment.

28

1    established "that the fact that the 'suspect was armed with a deadly weapon' does not render the

2    officers' response *per se* reasonable under the Fourth Amendment." (quoting *Glenn*, 673 F.3d at

3    872–73)); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 323, 325 (9th Cir. 1991).  Nonetheless,

4    officers need not "delay their fire until a suspect turns his weapon on them."  *George*, 736 F.3d at

5    838.  "If the person is armed—or reasonably suspected of being armed—a furtive movement,

6    harrowing gesture, or serious verbal threat might create an immediate threat."  *Id.*

7         Here, defendants move for summary judgment in their favor, arguing that plaintiff posed

8    an immediate threat to them during the foot pursuit when he said he had a gun, would kill Officer

9    Medina, yelled he had a gun again, reached in his waistband, "abruptly turned," and "extend[ed]

10   his arm and fist in a manner consistent with pointing a gun at the officers."  (Doc. Nos. 64 at

11   16:6–21; 68 at 6:19–20.)  In short, defendants assert that the officers reasonably believed that

12   plaintiff was armed, because he yelled that he had a gun, and they saw him make a series of

13   "furtive" or threatening movements.  *See George*, 736 F.3d at 838.  Defendants point to the

14   officers' depositions where they testified that they saw plaintiff "digging" into his waistband

15   (Doc. No. 64-3 at 49:16–17, 75:10–11), and saw plaintiff turn towards them and extend his right

16   arm with a clenched fist.  (*Id.* at 50:9–11, 77:11–78:10.)

17        Though both officers claim they saw plaintiff make the same threatening movements, the

18   court notes that their recollection of plaintiff's alleged verbal threats are not consistent with one

19   another.  In this regard, defendants cite to the deposition testimony of Officer Medina that just

20   before he performed a leg sweep on plaintiff, plaintiff had yelled that he had a gun and would kill

21   Officer Medina.  (*See* Doc. No. 64-3 at 39:18–20, 40:25–41:6.)  Moreover, according to Officer

22   Medina, Officer McCombs was close behind him when plaintiff "yelled" the words "I'm going to

23   kill you, I have a gun."  (*Id.* at 43:24–44:22.)  However, Officer McCombs testified that he did

24   not hear plaintiff "say anything right before the leg sweep."  (*Id.* at 69:7–9.)  Defendants also cite

25   to Officer McCombs' deposition testimony that plaintiff yelled he had a gun (a second time) after

26   the leg sweep and after the taser was deployed at plaintiff.  (*See id.* at 72–74.)  However, Officer

27   Medina testified at his deposition that plaintiff only yelled he had a gun once during the foot

28   pursuit, right before Officer Medina attempted the leg sweep.  (Doc. No. 65-6 at 3:21–4:4.)

Moreover, plaintiff advances a number of arguments disputing defendants' version of the facts. (*See* JF ¶¶ 10, 14, 16, 19.) With respect to the officers' testimony that plaintiff yelled he was armed, plaintiff argues such evidence is "self-serving" given that Officer Medina's search of plaintiff revealed no weapons and Officer McCombs was aware of this fact. (*Id.* ¶¶ 10, 14.) Of course, the fact that no gun was recovered does not necessarily mean that plaintiff did not yell he had one. Further, plaintiff himself concedes that he does not recall much of the incident. Thus, reliance on plaintiff's memory of the events alone to dispute defendants' version of the events is not appropriate.

The critical inquiry here is whether under the undisputed evidence on summary judgment it was objectively reasonable for the officers to believe that plaintiff was armed as they chased him. *See George*, 736 F.3d at 838; *see also Price v. Sery*, 513 F.3d 962, 968 (9th Cir. 2008) ("[A] law enforcement officer's use of force will be justified, or not, by what that officer *reasonably believed* about the circumstances confronting him.") (emphasis added). Under some circumstances, it could be appropriate for the court to conclude that there is no triable issue as to whether plaintiff was "reasonably suspected" of being armed, given that he cannot dispute the contention that he yelled he had a gun due to his own lack of memory. For example, in *Simmonds v. County of Genesse*, a suspect's father called the police to report that "his son had threatened to kill the parents of his former girlfriend" and that "his son might be armed." No. 09-12286, 2010 WL 1246778, at *1 (E.D. Mich. Mar. 25, 2010). The suspect, who did not survive, could not personally refute "the officers' uniform recital that he raised his hands as if to shoot and yelled that he had a gun." *Id.* at *4. Under the circumstances, the police had been unable to search the suspect prior to shooting him. Based on such evidence, the district court in *Simmonds* concluded that it was reasonable as a matter of law for the officers to believe the suspect was armed and that their use of deadly force was justified, thereby granting defendants' summary judgment motion. *Id.* at *4–6. However, the present case is clearly distinguishable from *Simmonds*. For, even if it is undisputed that plaintiff at some point yelled to the officers that he was armed, here, the officers' own accounts of the incident is inconsistent in material respects and the officers search of plaintiff prior to the pursuit and the shooting revealed to them that plaintiff was unarmed.

23

Indeed, plaintiff points to evidence before the court indicating that Officer Medina "thoroughly" searched him, "looking for immediate weapons while padding [sic] down all areas where a person may conceal one." (JF ¶ 5; PF ¶ 25 (defendants objecting that Officer Medina patted down "all areas" because he did not search plaintiff's "crotch or inside his boots"); *but see* Doc. No. 64-5 at 10:5–7 (Officer Medina's deposition: "Q[uestion.] Okay. And when you search his waistband, you cross your hand across his waistband, correct? A[nswer.] Correct."); *id.* at 10:17–20 ("Q[uestion.] And when you're searching the waistband, you're passing it throughout the – as far as your hand can reach in the waistband area, right? A[nswer.] Correct.").) Plaintiff avers he was wearing a pair of shorts, a t-shirt, and work boots when he was searched. (Doc. No. 65-11 ¶ 1.) It is undisputed that the search occurred in a section of the Holiday Inn parking lot that was brightly lit. (*See generally* Holiday Inn Video.) Yet Officer Medina found no weapons on plaintiff, even after searching plaintiff's "crotch" area (*see* Doc. No. 64-5 at 10:5–20), and Officer McCombs was aware that no weapons were recovered from plaintiff as a result of Officer Medina's search of him. (PF ¶ 27 (undisputed).) There is also no evidence that plaintiff went to his car, or some other location, to retrieve a gun after he was searched. (Doc. No. 64-3 at 35:3–6 (deposition of Officer Medina: "Q[uestion.] At any point in time did he make his way closer or even approach his own vehicle when you're trying to identify him? A[nswer.] No.").) Rather, it appears from the evidence that plaintiff was closely watched by at least one of the officers the entire time between when he was searched and when he fled. (Holiday Inn Video at 22:19:30– 29:45.) Even if plaintiff cannot genuinely dispute that he yelled he had a gun based on his own memory, defendants have failed to provide any support for the contention that a statement by a suspect that he has a gun is always enough to find that an immediate threat exists no matter the circumstances, let alone in a situation such as here where the suspect was "thoroughly" searched before the shooting. *See, e.g.*, *Hesselbein v. Beckham*, 168 F. Supp. 3d 1252, 1259 (E.D. Cal. 2016) (granting a new trial and observing that "where plaintiff had been thoroughly searched for a weapon and was handcuffed in the back of a secure patrol car, it would seem to the court that the only reasonable response to the statement, 'I have a gun' would be for an officer to ask, 'Where?'").

1    Accordingly, the determination of whether the officers could have reasonably believed

2    that plaintiff was armed under these circumstances turns on disputed material facts regarding the

3    extent of the search that occurred prior to the shooting and the officers' knowledge at the time of

4    the shooting.  *See LaLonde v. Cty. of Riverside*, 204 F.3d 947, 953 (9th Cir. 2000) (holding that if

5    "there is a material dispute as to the facts regarding what the officer or the plaintiff actually did,

6    the case must proceed to trial").  Here, construing the evidence in a light most favorable to

7    plaintiff, as the court must on defendants' motion for summary judgment, the court concludes that

8    a reasonable jury could find that plaintiff was thoroughly searched prior to the shooting "in all

9    areas where a person may conceal [a weapon,]" (PF ¶ 25), and both officers knew that plaintiff

10   was unarmed at the time they shot him.  For these reasons, the court concludes that there is a

11   triable issue of fact to be resolved by the fact-finder in this case.  "Because the excessive force

12   inquiry" here "requires a jury to sift through disputed factual contentions, and to draw inferences

13   therefrom," summary judgment is inappropriate.  *See Avina*, 681 F.3d at 1130 (citation omitted).

14   In light of the conclusion reached above, the court need not address whether genuine

15   disputes exist as to plaintiff's alleged furtive movements immediately prior to the shooting,

16   namely whether plaintiff reached into his shorts, raised his arm with a clenched fist, and pointed

17   at one or both of the officers in a threatening manner.  (*See* JF ¶¶ 16, 19.)  Even if it were

18   undisputed that plaintiff made these movements, which it is not, a reasonable jury could conclude

19   that the officers knew plaintiff was not armed and that any furtive movements he made would not

20   justify the use of deadly force.[12]

21   2.  Remaining *Graham* Factors

22   The court will turn briefly to consideration of the remaining *Graham* factors:  whether the

23   severity of the crime that the officers responded to in the Holiday Inn parking lot that night and

---

24   [12]  Moreover, the court notes that the bullet trajectory evidence before it also appears to

25   undermine defendants' version of events.  As Dr. Carpenter, the Kern County coroner, explained, plaintiff's bullet wounds could be consistent with him sitting on the ground with his torso in an

26   upright position before he was shot (Doc. No. 65-9 at 1:23–2:18, 3:14–4:14), thus calling into question whether plaintiff was running and abruptly turned around just before he was shot, as

27   defendants assert.  In any event, determining whether genuine disputes exist as to plaintiff's

28   alleged movements is not necessary for the resolution of the pending summary judgment motion.

1  plaintiff's subsequent flight on foot weighs in favor of finding the officers' use of deadly force

2  reasonable.  For the purposes of defendants' motion for summary judgment, the court concludes

3  that the answer to both questions is no.[13]

4      First, defendants do not argue that the seriousness of any crime that was being

5  investigated weighs in favor of the officers' decision to shoot plaintiff.  (*See id.*)[14]  Nonetheless,

6  in opposing the pending motion, plaintiff argues it is unreasonable for a police officer to shoot a

7  suspect who merely provides a false identification.  (Doc. No. 65 at 19:24–25.)[15]  Providing false

8  identification is a misdemeanor offense, *see* California Penal Code § 148.9, and is neither a

9  particularly serious nor violent crime.  *See, e.g.*, *Hesterberg v. United States*, 71 F. Supp. 3d

10  1018, 1029 (N.D. Cal. 2014) ("Although lying to a police officer is not a trivial offense, it is also

11  not inherently dangerous or violent."); *id.* (concluding "that providing a false last name in

12  connection with a warning about the leash law violation was not a severe crime").

13      With respect to consideration of the final *Graham* factor, plaintiff's flight alone is

14  insufficient to warrant the use of deadly force.  As noted above, "even when a felony suspect tries

15  to escape, 'where the suspect poses no immediate threat to the officer and no threat to others, the

16  harm from failing to apprehend him does not justify the use of deadly force to do so.'"

---

17  [13]  In moving for summary judgment defendants only briefly address these two *Graham* factors.

18  (*See generally* Doc. No. 64.)

19  [14]  For the first time in their reply brief, defendants advance an additional argument regarding the

20  *Graham* analysis with respect to the severity-of-the-crime factor.  Defendants argue that plaintiff's commission of California Penal Code § 69(a) (threatening a police officer while fleeing) weighs in favor of a finding that the officers' shooting of plaintiff was objectively

21  reasonable under the Fourth Amendment.  (*See* Doc. No. 68 at 5:19–6:2.)  Because defendants failed to raise this issue in their motion for summary judgment, (*see generally* Doc. No. 64),

22  thereby depriving plaintiff of the opportunity to respond, defendants have waived this argument.

23  *See United States v. Rozet*, 183 F.R.D. 662, 667 (N.D. Cal. 1998) ("Legal issues raised for the first time in reply briefs are waived."); *see also United States v. Gianelli*, 543 F.3d 1178, 1184 n.6

24  (9th Cir. 2008) ("[A]rguments raised for the first time in a reply brief are generally considered waived.").  Moreover, as discussed fully above, fleeing alone is insufficient to justify the use of

25  deadly force and the evidence with respect to the legitimacy of any threat posed by plaintiff is

26  disputed.

27  [15]  Perhaps more accurately, plaintiff argues that it is unreasonable to shoot a "person for mere suspicion of giving a false name."  (Doc. No. 65 at 19:25.)  However, plaintiff does not dispute

28  that he "gave Officers the false name of Rick Knight."  (PF ¶ 7 (undisputed).)

*Rodriguez*, 899 F.3d at 729 (quoting *Roderick*, 126 F.3d at 1201). Construing the facts in favor of plaintiff in considering defendants' motion for summary judgment, a reasonable jury could conclude that plaintiff did not pose an immediate threat to the officers or others during the foot pursuit. Thus, plaintiff's flight—with nothing more—is clearly an insufficient basis upon which to grant summary judgment in favor of defendants.

Accordingly, based upon the evidence presented by the parties, a reasonable trier of fact could find in plaintiff's favor with respect to his Fourth Amendment claim.[16] Defendants' motion for summary judgment based on the assertion that the deadly force employed was objectively reasonable under the circumstances of this case must therefore be denied.

**B.      Qualified Immunity**

As noted at the outset, defendants have also moved for summary judgment in their favor on qualified immunity grounds. (Doc. No. 64 at 2, 16–19.) Qualified immunity is an affirmative defense that "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009). The doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 231 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Mullenix v. Luna*, 577 U.S. ____, 136 S. Ct. 305, 308 (2015). It is defendants' burden to establish that they are entitled to qualified immunity. *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005).

When presented with a qualified immunity defense, the central questions for the court are: (1) whether the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that

---

[16]  In determining whether an officer's shooting was reasonable under the Fourth Amendment, courts consider "whether officers gave a warning before employing the force" at issue. *Glenn*, 673 F.3d at 876. Here, it is undisputed that Officer McCombs said to plaintiff, "stop, or I am going to shoot you" prior to shooting plaintiff. (PF ¶ 29 (disputed only as to whether the fact that the warning was given prior to plaintiff even turning means that plaintiff was not posing a threat of imminent harm).) Defendants note, but do not otherwise emphasize, the fact that Officer McCombs provided plaintiff with a verbal warning prior to shooting. (*See* Doc. No. 64 at 11:8–9.) Most importantly, defendants do not argue that Officer McCombs' giving of this warning is enough on its own to compel the granting of summary judgment in their favor.

1     the defendants' conduct violated a statutory or constitutional right; and (2) whether the right at

2     issue was "clearly established" at the time of the event in question. *Saucier v. Katz*, 533 U.S.

3     194, 201 (2001); *accord Pearson*, 555 U.S. at 236–42 (holding that courts need not analyze the

4     two prongs in any particular order). In addressing the pending motion with respect to plaintiff's

5     Fourth Amendment claim above, the court has already found that a triable issue exists as to

6     whether plaintiff's rights under the Fourth Amendment were violated when he was shot in the

7     back as he fled on foot from police. Accordingly, in considering qualified immunity on summary

8     judgment, the court turns to the second step of the qualified immunity analysis: whether

9     plaintiff's right not to be shot in the back as he fled the officers on foot was clearly established at

10     the time of the shooting.

11         "A Government official's conduct violates clearly established law when, at the time of the

12     challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable

13     official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*,

14     563 U.S. 731, 741 (2011) (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635,

15     640 (1987)); *see also Kisela v. Hughes*, ___ U.S. ____, 138 S. Ct. 1148, 1152 (2018) ("Qualified

16     immunity attaches when an official's conduct does not violate clearly established statutory or

17     constitutional rights of which a reasonable person would have known." (quoting *White v. Pauly*,

18     ___ U.S. ____, 137 S. Ct. 548, 551 (2017)). In this regard, while a case directly on point is not

19     required, "existing precedent must have placed the statutory or constitutional question beyond

20     debate." *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 741); *see also Hughes*, 862

21     F.3d at 783; *A. K. H.*, 837 F.3d at 1013; *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002)

22     ("The proper inquiry focuses on . . . whether the state of the law [at the relevant time] gave 'fair

23     warning' to the officials that their conduct was unconstitutional." (quoting *Saucier*, 533 U.S. at

24     202)). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly

25     established.'" *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742). This inquiry must

26     be undertaken in light of the specific context of the particular case, rather than as a broad general

27     proposition. *Id.*; *Saucier*, 533 U.S. at 201.

28     /////

1    Thus, "[i]n an 'obvious case,' the general standards established in *Garner* and *Graham*

2    can suffice to put an officer on notice that his conduct is unlawful." *Orn*, 949 F.3d at 1178

3    (quoting *Brosseau*, 543 U.S. at 199).  In less obvious cases, there must be "precedent that holds

4    'certain conduct is a constitutional violation under facts not distinguishable in a fair way from the

5    facts presented in the case at hand.'" *Id.* (quoting *Saucier*, 533 U.S. at 202).  Lower courts have

6    been instructed in this regard, "not to define the right at issue at a high level of generality." *Id.*;

7    *see also Kisela*, 138 S. Ct. at 1153; *Mullenix*, 136 S. Ct. at 308.

8    Additionally, "[t]he determination of whether a reasonable officer could have believed his

9    conduct was lawful is a determination of law that can be decided on summary judgment only if

10    the material facts are undisputed." *LaLonde*, 204 F.3d at 953.  If "there is a material dispute as to

11    the facts regarding what the officer or the plaintiff actually did, the case must proceed to trial[.]"

12    *Id.*; *see also Estate of Lopez by and through Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017)

13    ("[S]ummary judgment in favor of moving defendants is inappropriate where a genuine issue of

14    material fact prevents a determination of qualified immunity until after trial on the merits."

15    (quoting *Liston*, 120 F.3d at 975)).

16    Here, as determined above, a triable issue of fact exists as to whether Officers Medina and

17    McCombs had a reasonable belief that plaintiff was armed at the time of the shooting.  This

18    triable issue turns in large part on genuine disputes regarding facts surrounding the search that

19    occurred prior to the chase and shooting.  For instance, a jury could find that plaintiff was not

20    thoroughly searched by Officer Medina prior to the shooting and conclude that it was reasonable

21    for the officers to believe that plaintiff retrieved a gun from some part of his body that was

22    inadvertently not searched.  If a jury found those facts to be true and also found that plaintiff

23    made the alleged furtive movements, the court could at that point conclude that qualified

24    immunity shields the officers from liability because it is clearly established that police officers

25    may shoot a suspect who is reasonably believed to be armed and makes threatening movements.

26    *See George*, 736 F.3d at 838.

27    Conversely, a reasonable jury could conclude that plaintiff, who was wearing only a t-shirt

28    and shorts, was thoroughly searched in a brightly lit area of the Holiday Inn parking lot and

1   decide not to credit the officers' testimony that they believed plaintiff was armed when they shot

2   him twice in the back.  If the jury found those to be the facts, qualified immunity most certainly

3   would not shield the officers from liability because, since the Supreme Court's decision in

4   *Garner*, it has been clearly established that police officers may not shoot fleeing suspects in the

5   back who do not pose a physical threat to the officers or others.  471 U.S. at 11 ("Where the

6   suspect poses no immediate threat to the officer and no threat to others, the harm resulting from

7   failing to apprehend him does not justify the use of deadly force to do so."); *Rodriguez*, 899 F.3d

8   at 729 ("[E]ven when a felony suspect tries to escape, 'where the suspect poses no immediate

9   threat to the officer and no threat to others, the harm from failing to apprehend him does not

10  justify the use of deadly force to do so.'" (quoting *Roderick*, 126 F.3d at 1201)).  Because the

11  court must consider all disputed facts in a light most favorable to plaintiff for purposes of

12  considering qualified immunity on summary judgment, *Isayeva v. Sacramento Sheriff's Dep't*,

13  872 F.3d 938, 946 (9th Cir. 2017), the court concludes that defendants are not entitled to

14  summary judgment in their favor on qualified immunity grounds.

15  **C.      State Law Claims**

16          Plaintiff also asserts claims under California law for battery, negligence, and violation of

17  the Bane Act.  (Doc. No. 33 ¶¶ 38–56.)  Defendants move to dismiss plaintiff's battery and

18  negligence claims because they argue, the analysis under federal law and state law for these two

19  claims is effectively "equally applicable."  (*See* Doc. No. 64 at 21:10–11.)  In the police shooting

20  context, a plaintiff must demonstrate that the officers' use of force was unreasonable to prevail on

21  a battery claim under California law.  *See Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272

22  (1998).  Because, as discussed above, there is a genuine dispute as to whether the officers'

23  conduct was reasonable under the circumstances, defendants' motion for summary judgment on

24  plaintiff's battery claim will be denied.

25          The analysis for state-law violation of negligence in the police shooting context is

26  essentially the same as the analysis under the Fourth Amendment, except that California

27  negligence law allows courts to consider additional pre-shooting tactics, including whether the

28  officers "provoke[ed] a dangerous situation" that ultimately led to the use of deadly force.  *See*

1    *Hayes v. Cty. of San Diego*, 57 Cal. 4th 622, 639, 630 (2013).  Summary judgment in favor of

2    defendants on plaintiff's negligence claim is thus also not called for here in light of the court's

3    determination that a triable issue exists as to whether the officers violated plaintiff's Fourth

4    Amendment right even without considering any additional pre-shooting tactics.

5         Next, defendants move to dismiss plaintiff's Bane Act claim on the grounds that he has

6    failed to prove that the officers had "a specific intent to violate the arrestee's rights."  (Doc. No.

7    64 at 21:4–5) (quoting *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018).)  The

8    Ninth Circuit has held that "for the necessary showing for an excessive force claim under the

9    Bane Act," the statute "requires 'a specific intent to violate the arrestee's right to freedom from

10    unreasonable seizure.'"  *Reese*, 888 F.3d at 1043 (quoting *Cornell v. City & Cty. of San*

11    *Francisco*, 17 Cal. App. 5th 766, 802 (2017)).  "Evidence simply showing that an officer's

12    conduct amounts to a constitutional violation under an 'objectively reasonable' standard is

13    insufficient to satisfy the additional intent requirement under the Bane Act.  *Losee v. City of*

14    *Chico*, 738 Fed. App'x 398, 401 (9th Cir. 2018).[17]  "But it is not necessary for the defendants to

15    have been 'thinking in constitutional *or legal terms* at the time of the incidents, because a reckless

16    disregard for a person's constitutional rights is evidence of a specific intent to deprive that person

17    of those rights.'"  *Reese*, 888 F.3d at 1046 (citation omitted).

18         Here, the evidence before the court on summary judgment established disputed issues of

19    fact as to whether Officers Medina and McCombs acted with the requisite mental state required

20    for plaintiff to prevail on his Bane Act claim.  Viewing the evidence in a light most favorable to

21    plaintiff and drawing all reasonable inferences in his favor, a reasonable fact-finder could

22    conclude that the officers acted unreasonably and in reckless disregard of plaintiff's Fourth

23    Amendment rights when they shot him twice in the back while he was running away from them,

24    and after a search of his person before the chase revealed that plaintiff was unarmed.  *See Reese*,

25    888 F.3d at 1046; *see also S.T. by & through Niblett v. City of Ceres*, 327 F. Supp. 3d 1261, 1283

26    (E.D. Cal. 2018) (denying defendants' motion for summary judgment on plaintiff's Bane Act

27

28    [17] Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

1    claim because "a reasonable jury could conclude that officer Defendants acted unreasonably *and*

2    with reckless disregard for Thompson's rights under the Fourth Amendment when they shot him

3    twice in the back while he was fleeing.").  Therefore, defendants' motion for summary judgment

4    with respect to plaintiff's Bane Act claim must also be denied.

5                                        **CONCLUSION**

6            For all of the reasons explained above, defendants' motion for summary judgment (Doc.

7    No. 64) is denied.

8    IT IS SO ORDERED.

9        Dated:   __**June 10, 2020**__                    _____

10                                                 UNITED STATES DISTRICT JUDGE

32